# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHN DIMONDI ENTERPRISES LLC, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | C.A. No. N23A-03-008 PAW |
| | ) | |
| | ) | |
| BOARD OF ADJUSTMENT OF THE CITY OF NEW CASTLE, JAKSN, LLC, and BATTERY FEE OWNER LLC, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Appellees. | ) | |

Submitted: November 30, 2023
Decided: February 29, 2024

*On Appeal from the Board of Adjustment of the City of New Castle;*

**AFFIRMED**.

## <u>MEMORANDUM OPINION AND ORDER</u>

Josiah R. Wolcott, Esq. of Connolly Gallagher LLP, P.A., *Attorney for Appellant*.

John E. Tracey, Esq. of Young Conaway Stargatt & Taylor, LLP, *Attorney for Appellees JAKSN, LLC and Battery Fee Owner LLC*.

Michael J. Hoffman, Esq. of Tarabicos, Grosso & Hoffman, LLP, *Attorney for Appellee Board of Adjustment of the City of New Castle*.

**WINSTON, J.**

## I. INTRODUCTION

This appeal derives from a decision by the Board of Adjustment of the City of New Castle (the "Board") granting an application to build an apartment complex. Appellant, John DiMondi Enterprises, LLC ("DiMondi"), argues the Board erred in granting certain variances contained in the application and that the record lacks substantial evidence to support its decision. For the reasons set forth below, the Board's decision is **AFFIRMED.**

## II. FACTUAL AND PROCEDURAL BACKGROUND

On October 19, 2022, Battery Fee Owner LLC (the "Applicant") sought a special exception under the Zoning Code of the City of New Castle for a mixed-use residential property with commercial retail space (the "Project") for the property located on West Seventh Street in New Castle, Delaware (the "Property").[1] The Applicant also sought five variances.[2] The variances at issue on appeal involve: (i) a square footage variance which requested relief from the maximum building footprint of 40,000 square feet to permit a project containing two buildings with a combined footprint of 52,273 square feet; and (ii) a density variance which sought relief from 10 residential units per acre within a mixed use project to 36 units per acre, totaling 152 residential units.[3] After notice was given, a public hearing was

---

[1] Record ("R. at __.") at 0022-24. JAKSN, LLC owns the Property. *Id.*
[2] *Id.*
[3] R. at 0024.

held on December 22, 2022.[4]  At the hearing, the Applicant explained that the City of New Castle's Comprehensive Plan ("CP") states that former industrial properties in the Downtown Gateway ("DG") zoning district are "envisioned to be redeveloped as a new pedestrian-oriented neighborhood district supporting the CP's goals of encouraging mixed residential/retail/offices uses, and incentivizing private investment in the City's remaining undeveloped parcels and [Brownfields] harmoniously with nearby land uses."[5]  In support of the CP's goals, the Applicant further noted that due to the new residential unit deficiency, the Project is in "the best interest of the City, the convenience of the community and benefit[s] the public welfare."[6]  Further, the "[P]roject would not substantially injure or detract from the use of the neighboring property or the character of the neighborhood, but rather would improve the aesthetic of the City's gateway by improving a largely paved and unimproved parcel that currently contains only the existing liquor store."[7]

As to the variances at issue, the Applicant first commented that the density variance is prompted by the CP's desire to encourage the mixed use aspect of the Project favored by the CP and DG zoning.[8]  In addition, the density variance is "minimal in nature as evidenced by the fact that if the [P]roject were purely

---

[4] R. at 0028-32 and 136-203.
[5] R. at 0128-129.
[6] R. at 0129.
[7] *Id*.
[8] R. at 0129-30.

residential there would be no residential density cap… under the [Zoning] Code."[9] Turning to the square footage variance, the Applicant observed that most of the properties within the DG zoning classification could not accommodate 40,000 square foot buildings because they are all on less than one acre of land.[10] However, larger properties in the DG zone, including the Property, could accommodate more than 40,000 square feet.[11] For such properties, it is reasonable that the Zoning Code's 40,000 square foot limitation applies per-building as opposed to per-property.[12] If the 40,000 square foot limitation is imposed on larger properties, it would create heavily underutilized real estate.[13] A per-building limitation allows these larger properties to take full advantage of their size.[14] Additionally, the Applicant remarked upon the unique features of the property that justified expansion of the total building footprint including the need for remediation.[15] Absent the ability to reclaim its expenses for remediation, the Applicant declared the Project not viable.[16]

---

[9] R. at 0130.
[10] *Id.*
[11] R. at 0131.
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*

During its business meeting, the Board noted that the Property was a "contaminated eyesore and should be redeveloped in conformance with DG zoning and the CP."[17] In approving the special exception, the Board reasoned that the Project is: "(a) consistent with the CP and DG zoning; (b) similar and in harmony with other developments in the area; (c) [] good for the City in that it [] aesthetically improves and remediates a Brownfields site; (d) unlikely to have negative impact on City services; and (e) conditioned upon applicant's verified traffic data illustrating no worsening levels of service at 7th St[reet] and Washington St[reet] intersection."[18] As to the square footage variance, the Board found exceptional practical difficulty in making reasonable, cost effective improvements to the Property due to necessary remediation.[19] The Board also found the request not injurious to surrounding uses and consistent with DG zoning.[20] In approving the square footage variance, the Board again found that the Property's unique site characteristics presented exceptional practical difficulty and the evidence established that the requested unit count was essential to building a viable project.[21] In closing, the Board concluded that due to the fact that a majority of the Project's units will be one bedroom and

---

[17] R. at 133.
[18] R. at 0134.
[19] *Id*.
[20] *Id*.
[21] R. at 0135.

studio apartments, lower population density will be experienced, unlike with larger apartment units.[22]

Shortly after the Board issued its decision, DiMondi filed a Petition for Writ of Certiorari[23] and Opening Brief.[24]  The Applicant, JAKSN, LLC, and the Board (collectively, the "Appellees") jointly filed their Answering Brief.[25]  After DiMondi submitted its Reply Brief,[26] the Court held oral argument and reserved its decision.

## III.   PARTIES' CONTENTIONS

On appeal, DiMondi argues the square footage and density variances were solely economically motivated and the Board erred as a matter of law in finding exceptional practical difficulty because the variances were not "minimal" and failed to find that the variances would not affect the public.[27]  DiMondi also contends the record lacks substantial evidence to support the Board's decision.[28]  In response, Appellees contend DiMondi does not have standing to challenge the Board's decision.[29]  Second, Appellees assert the Board's decision: (i) is not contrary to the

---

[22] *Id.*
[23] D.I. 1.
[24] D.I. 15.
[25] D.I. 16.
[26] D.I. 17.
[27] Op. Br. at 9-11.
[28] *Id.* at 12.
[29] Ans. Br. at 10-12.

6

public interest; (ii) does not violate any requirements that the variances be "minimal"; and (iii) is supported by substantial evidence in the record.[30]

## IV.    STANDARD OF REVIEW

This Court hears appeals from boards of adjustment pursuant to 22 *Del. C.* § 382 and the Court's review of an administrative board's decision is limited. The Court merely determines whether the Board's findings are free from legal error and supported by substantial evidence.[31] Substantial evidence means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. [32] The Court will not reweigh the evidence, determine questions of credibility, or make its own factual findings.[33] Questions of law are reviewed *de novo.*[34] When reviewing a decision on appeal from an agency, the Court is required to search the entire record to determine whether, on the basis of all of the testimony and exhibits before the agency, it could fairly and reasonably reach the conclusion that it did.[35] "The burden of persuasion is on the party seeking to overturn a decision of the Board

---

[30] *Id.* at 14-24.
[31] *Dexter v. New Castle Cnty Bd. of Adjustment*, 1996 WL 658861, at *2 (Del. Super. Sept. 17, 1996), *aff'd*, 692 A.2d 414, 1997 WL 123583, at *1 (Del. Mar. 5, 1997) (TABLE).
[32] *Id*. (citations omitted).
[33] *Lingo v. Georgetown Bd. of Adjustment*, 2023 WL 2906162, at *2 (Del. Super. Apr. 11, 2023) (citations omitted).
[34] *Id*.
[35] *Holowka v. New Castle Cnty Bd. of Adjustment*, 2003 WL 21001026, at *4 (Del. Super. Apr. 15, 2003).

to show that the decision was arbitrary and unreasonable."[36]   During the appeal process, "the court will consider the record in the light most favorable to the prevailing party below."[37]

## V.   ANALYSIS

### A.   DiMondi Does Not Have Standing

As a threshold matter, the Appellees argue that DiMondi does not have standing to challenge the Board's decision.[38]  "Standing" refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance.[39]  "To establish standing, a plaintiff or petitioner must demonstrate first, that he or she sustained an 'injury-in-fact'; and second, that the interests he or she seeks to be protected are within the zone of interests to be protected."[40]  To determine whether an appellant's grievances lie within the zone of interests, the Court examines "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute in question" which in this case, seeks to "promot[e] health, safety, morals or the general welfare of the

---

[36] *Id.* (citing *Mellow*, 565 A.2d at 955-56).
[37] *Id*. (citing *Holowka,* 2003 WL 21001026, at *4).
[38] Ans. Br. at 10-12.
[39] *Dover Hist. Soc'y. v. Dover Plan. Comm'n*, 838 A.2d 1103, 1110 (Del. 2003) (citing *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991)).
[40] *Id*. at 1110.

community."[41]  However, grievances shared by the general public cannot be a basis for standing, unless the petitioner can demonstrate a concrete and particularized injury.[42]

DiMondi argues it is an aggrieved party with interests distinguishable from the general public because it owns a series of properties directly across from the Property, "which will likely see a significant increase in population and traffic, among other things."[43]  DiMondi's grievances, however, are not distinguishable from the general public and it has failed to assert any injury, much less a concrete and particularized injury.  Merely alleging close proximity to the Project and potential increase in population and traffic does not demonstrate that DiMondi suffered concrete and particularized harm.

---

[41] *Riverfront Hotel LLC v. Bd. of Adjustment of Wilm.*, 213 A.3d 89, 2019 WL 3884031, at *1 (Del. 2019) (TABLE).  *See also*, 22 Del. C. § 328.

[42] 838 A.2d at 1113.

[43] Reply Br. at 5.  In reviewing the record, DiMondi voiced its grievances to the Board via email, dated December 14, 2022, stating the "[A]pplicant seeks relief from existing rules and regulations for their own benefit" and it is not the Board's position to "[overrule] these just for the financial benefit of an applicant."  R. at 0118.  A public interest in lawfulness is insufficient for zone-of-interests standing in a zoning case. *Riverfront Hotel LLC*, 213 A.2d 89, 2019 WL 384031, at *2 (Del. July 11, 2019) (TABLE) (citing *Citizens for Smyrna-Clayton First v. Town of Smyrna*, 202 WL 31926613, at *5 (Del. Ch. Dec. 24, 2002), *aff'd*, 818 A.2d 970 (Del. 2003) (no standing where neighborhood property owner's interest "is no more than a keener variation of the interest of every member of the public in seeing the zoning ordinances enforced.").

As to taxpayer status, at oral argument, the Appellees admitted they would not have raised a standing argument but for the Delaware Supreme Court's decision in *Riverfront Hotel LLC v. Bd. of Adjustment of Wilm.*[44] Under 22 *Del. C.* Section 328, "[a]ny person … aggrieved by any decision of the board of adjustment, or any taxpayer … may present to the Superior Court a petition, duly verified, setting forth that such decision is illegal, in whole or in part, specifying the grounds of the illegality." The *Riverfront Hotel* Court explained that although Section 328 "seemingly provides that 'any taxpayer' may petition for review of a board of adjustment decision, we do not read [Section] 328 to permit [the Appellants] to bypass the ordinary test for standing in this case, which is one that does not directly implicate taxation or spending."[45] Absent a showing of an interest within the zone of interests protected by the zoning law, under *Riverfront Hotel*, mere status as a

---

[44] 213 A.3d 89, 2019 WL 384031, at *1 (Del. July 11, 2019) (TABLE).
[45] *Id.* at *1 fn. 8. Prior to *Riverfront Hotel*, the Delaware Supreme and Superior Courts held a person's status as a taxpayer was sufficient for standing under Section 328. *See Marriott Corp. v. Concord Hotel Mgmt.*, 578 A.2d 1097, 1990 WL 109878, at *1 (Del. July 13, 1990) (TABLE) (affirming the Superior Court's ruling that appellants as taxpayers have standing); *Wallace v. Bd. of Adjustment*, 1988 WL 97899, at *1 (Del. Super. Sept. 15, 1988) (finding two natural persons had standing as taxpayers under Section 328). Although the Court in *Markert v. Bd. of Adjustment of Rehoboth Beach* concludes that *Riverfront Hotel* was not intended to *sub silentio* overrule *Marriott Corp.v. Concord Hotel Mgmt*, DiMondi's reliance on *Markert* is misplaced because the *Markert* Court did not find standing based solely upon the appellant's taxpayer status. Indeed, in addition to taxpayer status, the Court found the "[a]pplicant's proposed hotel would negatively impact his health and safety, which the zoning code is designed to protect." *Id.* at 2.

10

taxpayer does not provide DiMondi with standing.  Accordingly, DiMondi does not have standing.

**B.     The Board Did Not Err and Substantial Evidence Supports its Decision**

Even if DiMondi had standing, the Board did not err as a matter of law and there is substantial evidence to support the Board's decision.  DiMondi's first two challenges relate to the Board's application of two of the four factors set forth in *Bd. of Adjustment of New Castle Cty. v. Kwik-Check Realty, Inc.* (the "*Kwik-Check*" factors).[46]  Lastly, because the Board failed to properly apply the *Kwik-Check* factors, DiMondi argues that the Board's decision is not supported by substantial evidence.[47]

**1.     The Board's Decision is Free from Legal Error**

DiMondi initially argues the variances are not minimal as a matter of law because the Applicant's requests are not the least increase possible.[48]  In support of its position, DiMondi concedes that the "Board need not make a separate finding that an economically motivated variance request is minimal."[49]  Yet, in its Reply

---

[46] 389 A.2d 1289, 1290 (Del. 1978).
[47] Op. Br. at 12-13; Reply Br. at 6-8.
[48] Op. Br. at 9 and 11.  DiMondi centers the interpretation of "minimal" around the definition used in Merriam-Webster's Collegiate Dictionary for the word, "minimum" ("the least possible").
[49] *Id*. at 9 (citing to *McLaughlin v. Bd. of Adjustment of New Castle Cnty*, 984 A.2d 1190, 1192 (Del. 2009) (explaining that the application of the *Kwik-Check* factors

11

Brief and at oral argument, DiMondi argues the exact opposite. DiMondi now contends that the Board erred by "not engag[ing] in an analysis to determine whether the dimensional changes were minimal…."[50] Thus, DiMondi maintains that when the sole motivation for a variance is economically based, the board of adjustment may only grant the variance if it finds that the variance is "minimal."

Before directly addressing DiMondi's position, it is necessary to note that the two variances at issue are area variances. Area variances relate to the practical difficulty in using a particular property for a permitted use.[51] To determine whether an area variance should be permitted, the four *Kwik-Check* factors are applied.[52] Under *Kwik-Check*, to determine whether exceptional practical difficulties exist, the administrative board should take into consideration: (i) the nature of the zone in which the property lies; (ii) the character of the immediate vicinity and the uses contained therein; (iii) whether the removal of the restriction would seriously affect neighboring property and uses; and (iv) if the restriction is not removed, would it create unnecessary hardship or exceptional practical difficulty for the owner in relation to his efforts to make normal improvements under the use provisions of the

---

does mandate a "separate analytic step when considering an 'economically motivated' application for an area variance").

[50] Reply Br. at 11. DiMondi notes that the Board's decision observes the Applicant's indication that the density variance was a minimal dimensional change. Op. Br. at 3 (citing R. at 0130).

[51] *Kwik-Check Realty, Inc.*, 389 A.2d at 1290.

[52] *Id*.

ordinance.[53]   When a board finds an exceptional practical difficulty, it finds the inability to improve one's business or to stay competitive as result of area limitations.[54]

Turning to DiMondi's contention that under the fourth factor, "exceptional practical difficulty," a finding of minimal must also be reached.  The term "minimal" arises from the *Kwik-Check* Court's statement that "[a] practical difficulty is present where the requested dimensional change is minimal and the harm to the applicant if the variance is denied will be greater than the probable effect on neighboring properties if the variance is granted."[55]  The Delaware Supreme Court explained this "observation [is] a specific example of how the Board should consider the four factors, weighing the potential harm to the neighboring properties by granting the variance against the potential harm to the property owner by denying it."[56]  Accordingly, the Board does not need to make a separate finding of "minimal" when considering an economically motivated area variance.[57]  Because DiMondi's claim of error rests on an incorrect premise, it fails.[58]

---

[53] *Id*.
[54] *Id*.
[55] 389 A.2d at 1289.
[56] 984 A.2d at 1192.
[57] *McLaughlin v. Bd. of Adjustment of New Castle Cnty*, 984 A.2d 1190, 1192 (Del. 2009).
[58] *Id*. (rejecting an appellant's argument that a board may not grant an area variance solely for economic reasons unless it finds that the variance is minimal).  DiMondi's argument also fails under its own analysis.  DiMondi claims, without any support,

DiMondi's second contention is that the Board failed to consider the third *Kwik-Check* factor – affect on neighboring properties. This argument raises a factual issue without regard to the record. As to the square footage variance, the Board determined that the Property will not adversely affect neighboring properties by considering that the removal of the restriction would not make an unwanted impact on the neighboring properties, and that it would be good for the community to further develop the area.[59] The Board also considered the impact on neighboring properties in relation to the density variance. Despite two Board members' disapproval, the Board approved the density variance after hearing the proposed configuration of the Property, the number of residents it will attract, and that the residences will be built vertically rather than spread across an acre of land.[60] Therefore, the record

---

that the variances were solely economically motivated. However, the Applicant testified, and the Board found that the density variance request was "prompted by the CP's desire to encourage the mixed use [sic] aspect of the project favored by the CP and DG zoning." R. at 0130. Similarly, as to the square footage variance, the Board found the "request to be consistent with DG zoning and not injurious to surrounding uses." R at 0134. Additionally, the entire project proposal was motivated by the goals of the CP – "encouraging mixed residential/retail/office uses, and incentivizing private investment in the City's remaining undeveloped parcels … harmoniously with nearby land uses." R. at 0128-29. Also, the Board found, among other things, the Project consistent with the CP and DG zoning, and good for the City because it improves and remediates a Brownfields site. R. at 0134. Accordingly, under DiMondi's analysis a separate finding of minimal would not be warranted. *See also*, Section B.2, below.

[59] R. at 0194-95.

[60] R. at 0202-03.

14

sufficiently demonstrates that the Board properly applied the *Kwik-Check* factors by considering the affect of the variances to the neighboring properties.

        **2**.      **The Board's Decision is Supported by Substantial Evidence**

As set forth above, under the substantial evidence standard, the Court is merely required to review the record and determine whether, on the basis of all of the testimony and exhibits before the agency, it could fairly and reasonably reach the conclusion that it did. It is not the Court's position to reweigh the evidence. After a thorough review of the record, the Court finds there is more than sufficient evidence on the record to support the Board's decision.

## V.    <u>CONCLUSION</u>

Substantial evidence exists to support the Board's decision and no legal error exists. Accordingly, the Board's decision is **AFFIRMED**.

        **IT IS SO ORDERED**.

                                        */s/Patricia A. Winston*
                                        **Patricia A. Winston, Judge**